1
2
3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

4
5

WORLD ACCESS, INC., a Colorado
corporation,

No.   2:15-CV-285-SMJ

6

Plaintiff,

7

v.

8
9

MIDWEST UNDERGROUND
TECHNOLOGY, INC., an Illinois
corporation, doing business as SABRE
INDUSTRIES,

**ORDER DENYING, IN PART, AND
GRANTING, IN PART,
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

10
11

Defendant.

12

Before the Court, without oral argument, is Defendant Midwest

13 Underground Technology, Inc.'s Motion for Summary Judgment, ECF No. 6.

14 Defendant asks the Court to rule in its favor and find against Plaintiff on all causes

15 of action in the complaint. Plaintiff World Access, Inc. opposes the motion.

16 Having reviewed the pleadings and the file in this matter, the Court is fully

17 informed and, for the reasons detailed below, **DENIES**, in part, and **GRANTS**, in

18 part, Defendant's motion.

19   **I.   Background Facts**

20

Plaintiff World Access, Inc. ("World Access"), a Colorado corporation, and Defendant Midwest Underground Technology, Inc. ("Midwest Underground"), an Illinois corporation, entered into a Master Service Agreement ("MSA" or "Agreement"). ECF No. 1 at ¶¶ 1-3; ECF No. 8-1. The Agreement was executed on May 1, 2014. ECF No. 8-1. As relevant here, Midwest Underground is a general contractor that entered into agreements with cellular service carriers to build and activate cell phone towers for major service providers. ECF No. 1 at ¶¶ 3-5. World Access was a subcontractor to Midwest Underground and was responsible for providing materials, labor, and related services, among other things, to Midwest Underground. ECF No. 8-1 at 1.

Under the Agreement, World Access could only perform services after it received a Purchase Order from Midwest Underground specifying the work to be done. ECF No. 8-1 at Section 2.02. World Access received numerous such requests to complete work in New Mexico, Texas, and Washington, including within the Eastern District of Washington. ECF No. 1 at ¶ 7. To receive payment for its work, the Agreement required World Access to submit an invoice to Midwest Underground for completed services. ECF No. 8-1 at Section 3.03. Midwest Underground has paid all such invoices except for one. However, World Access alleges that Midwest Underground has improperly refused to issue Purchase Orders for Change Orders which World Access completed on assurances

from Midwest Underground that it would be compensated. ECF No. 14 at 3-4. Midwest Underground denies these allegations.

Importantly, Section 5.11 of the Agreement contains a choice-of-law provision whereby the parties agreed that Iowa law would govern any dispute. ECF No. 8-1. This section also states that the state and federal courts in Woodbury, Iowa were the agreed forums with jurisdiction to resolve a dispute arising from the Agreement. *Id.*

While World Access worked with Midwest Underground under the Agreement, World Access engaged with Beyond Wireless Ltd. ("Beyond Wireless"), a former World Access employee's company, to have Beyond Wireless work with World Access on its projects. ECF No. 17 at ¶ 18. World Access and Beyond Wireless entered into a contract ("BW-WA contract") on January 3, 2014, regarding their working relationship. ECF No. 20-1. This contract contained a dispute resolution provision identifying the District Court for Douglas County, Colorado as the court the parties chose to settle any disputes. *Id.* at ¶ 12. The BW-WA contract is silent as to which state's law would apply to a dispute. *Id.* Beyond Wireless stopped working with World Access and began working directly with Midwest Underground in early 2015. ECF No. 10 at ¶ 5. The BW-WA contract expired on July 2, 2015. ECF No. 20-1 at ¶ 2; ECF No. 28 at Bates No. WA_MUTI0004191-92.

1

2

## II.  **Procedural Background**

Plaintiff World Access initiated the present action on October 9, 2015. ECF No. 1. Midwest Underground filed its Answer and Counterclaim on January 11, 2016. ECF No. 5. The following month, on February 26, Midwest Underground filed the present Motion for Summary Judgment. ECF No. 6. The parties subsequently exchanged responses, replies, and surreplies. ECF Nos. 14, 18, 26, and 29. The parties have yet to engage in formal discovery. ECF No. 16 at ¶ 2.

## III.  **Summary Judgment Standard**

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once a party has moved for summary judgment, the opposing party must point to specific facts establishing that there is a genuine dispute for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). If the nonmoving party fails to make such a showing for any of the elements essential to its case for which it bears the burden of proof, the trial court should grant the summary judgment motion. *Id.* at 322. "When the moving party has carried its burden under Rule [56(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he

nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal citation omitted). When considering a motion for summary judgment, the Court does not weigh the evidence or assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

For summary judgment purposes a fact is material if it might affect the suit's outcome under governing law. *Id*. at 248. A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could find in favor of the non-moving party. *Id.*

**IV.    Discussion**

**a.  The Applicable State Law**

As a threshold matter, this Court must first determine which state's substantive law applies since this case raises contractual and tort based state-law claims. A federal court sitting in diversity applies the substantive law of the forum state in which the court is located, including that state's choice-of-law rules. *See Blangeres v. United States Seamless, Inc.*, No. 13-cv-260, 2015 U.S. Dist. LEXIS 165796, at *9 (E.D. Wash. Dec. 10, 2015) (citing *First Intercontinental Bank v.*

*Ahn*, 798 F.3d 1149, 1153 (9th Cir. 2015)); *Carideo v. Dell, Inc.*, 706 F.Supp.2d 1122, 1126 (W.D. Wash. Feb. 12, 2010) (applying Washington law).

### i. Iowa Law Applies to World Access's Contract Based Claims

In Washington, a contract's choice-of-law provision is generally enforced. *McKee v. AT&T Corp.*, 191 P.3d 845, 851 (2008) (citations omitted); 25 David K. DeWolf, et al, *Wash. Prac. Contract Law and Practice* § 5:18 (3d ed. 2016). However, if parties dispute a contract's choice-of-law provision, an actual conflict between the laws or interests of Washington and those from the other state must exist before courts engage in a conflict-of-laws analysis. *Carideo*, 706 F.Supp.2d at 1126. Courts disregard a contract's choice-of-law provision and apply Washington law "if, without the provision, Washington law would apply; if the chosen state's law violates a fundamental public policy of Washington; and if Washington's interest in the determination of the issue materially outweighs the chosen state's interest." *McKee*, 191 P.3d at 851. All three conditions must be met. *Id.*

Here, at Section 5.11, the MSA unequivocally states the Agreement "shall be governed, construed and enforced by the laws of the States of Iowa." ECF No.

8-1 at 10; ECF No. 17-1 at 10. Moreover, the parties' filings do not dispute the contract's choice-of-law provision. Indeed, in their filings both parties cite to Iowa and Washington law, and an actual conflict between the states' laws regarding plaintiff's contract claims does not exist. *See, e.g.*, ECF No. 6 at 5 n. 2 (Defendant notes that Iowa and Washington law are in accord as to how full performance discharges a party's contractual duties); ECF No. 14 at 6-7 (Plaintiff cites Iowa and Washington law regarding its *quantum meruit* claim and notes the states are in accord). Therefore, pursuant to Washington law and under these facts, Iowa law applies to the contract based claims in this dispute.

### ii. Washington Law Applies to World Access's Tortious Interference with Contract Claim

Under Washington law, a contract's choice-of-law provision does not govern tort claims arising out of the contract. *Carideo*, 706 F.Supp.2d at 1127 (citation omitted). Moreover, Iowa and Washington law are substantially in accord as to the elements of a tortious interference with contract claim. *See Leilang v. Pierce Cty. Med. Bureau, Inc.*, 930 P.2d 288, 300 (1997); *see also Helm Fin. Corp. v. Iowa Northern Ry. Co.*, 214 F.Supp.2d 934, 996 (N.D. Iowa May 31, 2002). Courts will not undertake a conflict-of-law analysis unless an actual conflict between two states' laws on a tort based claim exists. *Helm*, 214 F.Supp.2d at 996.

ORDER - 7

In this case, World Access's claim against Midwest Underground for tortious interference arises out of Midwest Underground working directly with Beyond Wireless, not from the MSA. ECF No. 1 at ¶¶ 34-38. Given that: (1) the Agreement's choice-of-law provision does not apply to tort based claims nor to all possible claims between the parties since the provision's language limits it to the Agreement; (2) the conduct giving rise to this claim involved Midwest Underground's actions vis-à-vis Beyond Wireless; (3) there is no true conflict between Iowa and Washington law as to the elements of a tortious interference with contract claim; and (4) the law of the forum state applies to a case in a federal court sitting in diversity, Washington law applies to World Access's tort based claim.

### b.  The Court has Jurisdiction in this Case, Section 5.11 of the MSA Not Withstanding

The Court also notes that the Agreement identifies the state and federal courts of Woodbury County, Iowa as having jurisdiction over any disputes arising out of the MSA. ECF No. 8-1 at 10; ECF No. 17-1 at 10. However, given that (1) World Access chose to litigate this dispute in this Court, in part, because a number of the factual circumstances giving rise to the dispute occurred in this District, (2) Midwest Underground does not object to this Court's jurisdiction, and (3) the Court has subject matter jurisdiction and venue is proper, the Court can properly hear this case. ECF No. 1 at ¶¶ 7 and 12.

Having addressed these threshold matters, the Court now turns to the present motion's merits.

### c. Portions of World Access's Breach of Contract Claim Survive Summary Judgment

In order for World Access's breach of contract claim to survive summary judgment, it must establish that a genuine issue of material fact remains for trial. Under Iowa law, World Access must prove the following elements to prevail on this cause of action: (1) the existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract; (4) Midwest Underground breached the contract in a particular way; and (5) that it suffered damages as a result of the breach. *Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 846 (Iowa 2010) (citing *Molo Oil. Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998)).

Here, the parties agree the MSA is the contract at issue. The dispute centers on whether Midwest Underground performed all the obligations it owed World Access. As to Purchase Orders between the parties, the record—viewed in the light most favorable to non-movant World Access—demonstrates that Midwest Underground has paid World Access for all issued Purchase Orders except one, invoice number 2015193, or project WA902. ECF No. 14 at 5; ECF No. 18 at 2-3; ECF No. 17 at 4. Roughly $28,700 is at issue there. ECF No. 17 at 4. World Access claims that the Purchase Order for WA905 is also outstanding. *Id.*; ECF

No. 26 at 3(a). However, Midwest Underground has provided sufficient evidence, and World Access has not rebutted said evidence, showing that Midwest Underground has paid World Access for WA905. ECF No. 9-1 at Ex. B. As such, summary judgment is granted as to the Purchase Orders Midwest Underground has already paid. The dispute over WA902, however, remains.

The Court now turns to the remaining claims related to this cause of action: the alleged Change Orders and claims that Midwest Underground improperly breached agreements for World Access to perform work at four sites in Texas. ECF No. 14 at 5-6.

### i. World Access's Claim that Midwest Underground Owes It Payment for Change Orders Survives Summary Judgment

As to the Change Orders issue, World Access must prove elements two through five of a breach of contract claim as detailed above. *Royal Indem. Co.*, 786 N.W.2d at 846. Presently, element two regarding the terms of the contract is critical and contested.

### 1. The MSA's Terms and Conditions as to Change Orders are Unclear

The Agreement defines Change Orders as "any Services identified in a Purchase Order, or otherwise, that Subcontractor is asked to perform that is not identified in the Scope of Work or reasonably implied or assumed therein." ECF No. 8-1 at page 2, Article I. The MSA further states that World Access, as

subcontractor, "shall under no circumstances perform Services prior to the receipt of an applicable Purchase Order. . . . [and] shall not perform any Services or other work not specifically identified or reasonably implied by a Purchase Order (the 'Authorized Work')." *Id.* at Section 2.02. However, World Access could perform work outside the four corners of a Purchase Order if it submitted a Change Order and Midwest Underground approved it in accordance with Exhibit C. *Id.* Midwest Underground made clear that it "shall not be liable for payment of any item included on an invoice or request for payment that is not Authorized Work or an approved Change Order." *Id.*

Iowa courts have held that a scheme regarding written change orders between contractors such as the one detailed in the MSA is allowed. *T & K Roofing & Sheet Metal Co. v. Rockwell Collins, Inc.*, No. 05-0700, 2006 WL 1009015, at *2 (Iowa Ct. App. April 12, 2006) ("However, if required, the request for additional compensation must be made in writing and cannot be made after the work is complete. The key to the sufficiency of a writing as a change order is whether there was *approval* of additional compensation by the owner.") (internal quotations and citations omitted; emphasis in the original).

Here, Midwest Underground required World Access to submit Change Orders in writing. The MSA purports to include a form at Exhibit C specifying the Change Order form to be used, but Exhibit C is a blank page entitled "Change

Order From [*sic*]" with a World Access representative's initials at the bottom right. ECF No. 8-1 at 14; ECF No. 17-1 at 14. Nevertheless, World Access provided Change Order requests to Midwest Underground in writing. For example, in an email dated February 26, 2015, World Access submitted a Change Order request, per Midwest Underground's request, regarding "Excessive Rock in Anchor Holes." ECF No. 17-1 at Bates No. WA_MUTI0003340. Similarly, in April 2015, World Access again engaged in correspondence alerting Midwest Underground about Change Orders and "out of scope work." ECF No. 17-1 at Bates No. WA-MUTI0003455-60. Again, a few months later, on August 5, 2015, Darrin Peters at Midwest Underground and Daryl Moe from World Access discuss Change Orders. ECF No. 17-1 at Bates No. WA_MUTI0001838. The correspondence, however, does not state that the Change Orders were approved. *Id.* Nevertheless, Peters writes, "[i]f we do not receive the basic close-out information as required by a client then I cannot push for payment on the base work let alone the *additional work.*" (emphasis added). *Id.* A few days later, on August 12, 2015, Peters again assures Moe that Midwest Underground is looking at the Change Order: "I need to get this base project close-out's 100% complete and then will move onto the change order related items, you have my word we will discuss and be fair here." ECF No. 17-1 at Bates No. WA_MUTI0001808.

On these facts, World Access has presented enough evidence to establish that a genuine issue of material fact exists as to the MSA's contractual terms and conditions related to Change Orders. Although Section 2.02 of the Agreement required World Access to submit a written Change Order for Midwest Underground's approval, the MSA does not offer much guidance as to the Change Order approval process. That World Access was to submit requests in writing is clear. However, the Agreement does not specify how World Access was to submit those requests. For its part, Midwest Underground was to approve such requests; yet the Agreement only states that Midwest Underground had to approve the requests before World Access could begin any work. It does not specify the process by which approval would be secured or rejected nor how the decision would be communicated to World Access. Importantly, Section 2.02 refers to Exhibit C as the vehicle for approving Change Order requests. Yet, Exhibit C is a blank page offering no guidance to either party on how to proceed on Change Order requests. Moreover, the correspondence World Access submitted shows that, at least on these occasions, World Access submitted written Change Order requests to Midwest Underground. Indeed, Peters acknowledged the Change Order requests in writing to Moe, "you have my word we will discuss and be fair here." ECF No. 17-1 at WA_MUTI0001808. Without the benefit of further discovery, including depositions of key individuals at World Access and Midwest

Underground, it is simply unknown at this time how Midwest Underground handled World Access's Change Order requests. Midwest Underground's assertion that "[i]t is undisputed that no change orders were approved for the work [World Access] claims payment for," is insufficient since the MSA is incomplete. ECF No. 18 at 4.

As such, given the MSA's silence on key terms and conditions regarding Change Order requests, especially regarding whether World Access's requests were approved and the process by which Midwest Underground considered said requests, a genuine issue of material fact remains.

### ii. A Genuine Issue of Material Fact Remains as to Whether Midwest Underground Followed the MSA's Terms in Canceling the Issued Purchase Orders Regarding the Four Texas Sites

As to the four sites in Texas that World Access alleges Midwest Underground improperly assigned to a different subcontractor, World Access must prove elements two through five of a breach of contract claim as detailed above. *Royal Indem. Co.*, 786 N.W.2d at 846.

There is no dispute that the MSA controls here, specifically "Section 4.13. Term & Termination." As Midwest Underground states, the Agreement is unambiguous. Midwest Underground reserved the right to terminate or suspend the Agreement, services, or any Purchase Order, in whole or in part, at its convenience. ECF No. 8-1 at Section 4.13. This section also makes clear that

ORDER - 14

Midwest Underground's sole liability would be for services World Access performed before the Purchase Order's termination. *Id.* However, Midwest Underground neglected to highlight in its briefing that the Agreement also required it to provide World Access "with five (5) days prior notice." *Id.* Email notification would have sufficed. *Id.*

The record reflects that Midwest Underground provided World Access the Purchase Orders requesting work on the four Texas sites at issue in January and March of 2015. ECF No. 17-1 at Bates Nos. WA_MUTI0000010, 13, 19, 26. Neither party, however, has submitted evidence regarding the Agreement's notice requirement. Such notice may or may not have been in writing. ECF No. 17 at ¶ 16 (Daryl Moe's declaration relating conversations with multiple Midwest Underground representatives indicating that Midwest Underground would "take care of" World Access, among other things). Given the references to discussions and potential discussions between representatives at World Access and Midwest Underground, said conversation could have occurred regarding this issue but the record has not been developed on this point. *See, e.g.*, ECF No. 17-1 at WA_MUTI0001808. As such, a genuine issue of material fact remains.

### d. World Access's *Quantum Meruit* Cause of Action Survives Summary Judgment

Iowa law permits parties to plead alternative recovery theories in contract disputes. *Phillips Kiln Servs. v. Int'l Paper Co.*, No. C02-4005-MWB, 2002 U.S.

Dist. LEXIS 10186, at *20-21 (N.D. Iowa June 3, 2002) (citing Iowa case law and the state's rules of civil procedure for the proposition that a plaintiff can plead breach of contract and *quantum meruit* claims as alternative recovery theories); *see also Webster Indus. Inc., v. Northwood Doors, Inc.*, 234 F.Supp.2d 981, 992-94 (N.D. Iowa Nov. 4, 2002). However, parties cannot *recover* under an express contract theory and a *quantum meruit* theory.[1] *Phillips Kiln Servs.*, 2002 U.S. Dist. LEXIS 10186 at *14.

Moreover, while express and implied-in-fact contracts cannot coexist with respect to the same subject matter, they *can coexist* where an implied-in-fact contract addressed a point not covered by an express contract. *Id.* at *14-16. Indeed, implied-in-fact contracts are found when "there is merely a tacit promise, one that is inferred in whole or in part from expressions other than words on the part of the promisor." *Iowa Waste Sys. V. Buchanan Cty.*, 617 N.W.2d 23, 29 (Iowa Ct. App. May 31, 2000) (internal quotations and citations omitted).

If a party chooses to seek recovery for breach of an implied-in-fact contract, it must show "(1) the services were carried out under such circumstances as to give the recipient reason to understand (a) they were performed for him and not some other person, and (b) they were not rendered gratuitously, but with the

---

[1] Courts disfavor using the term *quantum meruit*; breach of an implied-in-fact contract is the preferred terminology. *Iowa Waste Sys. V. Buchanan Cty.*, 617 N.W.2d 23, 29 (Iowa Ct. App. May 31, 2000). The term *quantum meruit* is "used to denote a particular subclass of implied-in-fact contracts—an implied-in-fact contract to pay for services rendered." *Id.*

expectation of compensation from the recipient; and (2) the services were beneficial to the recipient." *K&L Landscape & Constr. v. Dakota Contrs.*, No. 4-384/03-0676, 2004 Iowa App. LEXIS 1151, at *8 (Iowa Ct. App. Oct. 14, 2004) (quotations and citations omitted).

To the extent Midwest Underground argues that World Access's implied-in-fact contract cause of action must be dismissed because of "the existence of a written contract and the complete overlap between the contract and the quantum meruit claims," that argument is unpersuasive. ECF No. 6 at 5. Iowa courts allow parties to plead both breach of contract and breach of implied-in-fact contract, as detailed above. Indeed, in reply, World Access clarifies that under its pleaded claims, "[e]ither all of the work done/damages are covered by the MSA and are contractual damages, or some or all of the damages are for work done outside the contract, in which case they are covered by the quantum meruit claim." ECF No. 14 at 6. Given the discussion at Section IV(c), *supra*, genuine issues of material fact remain regarding Midwest Underground's handling of Change Order requests and whether it approved them. These facts, when further developed, will also be relevant to this claim's elements.

Midwest Underground also cites authority establishing that recovery under *quantum meruit* "cannot be had if the proof offered in support thereof establishes an express contract." *Trs. of the Iowa Laborers Dist. Council Health & Welfare*

*Trust v. Ankeny Cmty. Sch. Dist.*, 865 N.W.2d 270, 279 (Iowa Ct. App. Dec. 24, 2014) (citing *Sammon v. Roach*, 235 N.W. 78, 79 (Iowa 1931)). Assuming this proposition is true, which it may or may not be given that the appellate court in that case questioned *Sammon's* continuing validity, it is presently unclear whether the facts in this case render the contract, vis-à-vis the Change Orders World Access submitted to Midwest Underground, an express or implicit contract.

As such, a genuine issue of material fact as to the parties' contractual obligations—and whether these were express or implied—remains, preserving this cause of action as well.[2]

### e.  World Access's Claim for Breach of the Covenant of Good Faith and Fair Dealing Survives Summary Judgment

Iowa law recognizes an implied duty of good faith and fair dealing in all contracts. *Team Two, Inc. v. City of Des Moines*, No. 12-1565, 2013 WL 1749909, at *5 (Iowa Ct. App. April 24, 2013) (citing *Bagelmann v. First Nat'l Bank*, 823 N.W.2d 18, 34 (Iowa 2012)). Although the covenant's limits are unclear, it does not "'give rise to new substantive terms that do not otherwise exist in the contract.'" *Bagelmann*, 823 N.W.2d at 34 (citing *Mid-American Real Estate Co. v. Iowa Realty Co.*, 406 F.3d 969, 974 (8th Cir. 2005)). Rather, the "covenant

---

[2] The parties seem to blur the lines between causes of action for unjust enrichment and implied-in-fact contracts. *See* ECF No. 14 at 7 and ECF No. 18 at 1, 6-7. As Iowa courts have explained, the two are not the same nor are they interchangeable; causes of action alleging breach of an implied-in-fact contract are rooted in contract law whereas unjust enrichment claims are more appropriately described as grounded in the remedy of restitution. *See Iowa Waste Sys. v. Buchanan Cty.*, 617 N.W.2d 23, 28-30 (Iowa Ct. App. May 31, 2000).

prevents one party from using technical compliance with a contract as a shield from liability when that party is acting for a purpose contrary to that for which the contract was made." *Mid-American Real Estate Co.*, 406 F.3d at 974.

Here, World Access pleads this cause of action as an alternative recovery theory that rests on the same pleaded damages as the breach of contract claim. ECF No. 14 at 8. As discussed, further discovery is needed regarding Midwest Underground's contractual obligations regarding the Change Orders. *See* Section IV(c), *supra*. On this record, issues of material fact remain regarding the parties' obligations. As such, this cause of action also survives.

### f.  World Access's Tortious Interference with Contract Claim Survives Summary Judgment

Under Washington law, the elements for intentional interference with a contract are "(1) the existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage." *Leingang v. Pierce Cty. Med. Bureau, Inc.*, 930 P.2d 288, 300 (1997).

Here, the parties dispute whether a valid contractual relationship existed between Beyond Wireless and World Access. It is undisputed that World Access entered into a contract with Beyond Wireless. ECF No. 20-1. World Access asks

the Court to exclude the contract between Beyond Wireless and World Access ("BW-WA contract") from the record because, World Access claims, Midwest Underground's attorney failed to properly authenticate it. ECF No. 26 at 2. Defense counsel's declaration states that World Access produced the copy of the BW-WA contract to him. ECF No. 20 at 2. This declaration is based on personal knowledge of how Midwest Underground obtained the contract. Based on this statement, the contract was properly authenticated, and the contract at ECF No. 20-1 is admitted into the record.

The Court notes, however, that defense counsel should have also submitted to the Court the BW-WA contract's corresponding extension notice, which World Access produced simultaneously to Midwest Underground. ECF No. 26 at 2; ECF No. 28 at Bates No. WA_MUTI0004191-92. This document demonstrates that the BW-WA contract was extended six months to July 3, 2015. ECF No. 28 at Bates No. WA_MUTI0004191-92. The Court is unclear why, after receiving evidence of the BW-WA contract's extension, and submitting the contract to the Court, Midwest Underground argued that the contract at issue had expired on January 4, 2015. ECF No. 18 at 8. At best, this was defense counsel's mistake. At worst, this could be seen as an effort to mislead the Court. The Court will assume the former but reminds all counsel to take care and be forthright with the information presented to the Court.

Moreover, Midwest Underground's argument that the BW-WA contract's exclusivity provision became void when World Access failed to pay Beyond Wireless does not dispose of this claim at this juncture. ECF No. 18 at 8-9. Vilmantas Narbutas's declaration states that on or about January 2015, Beyond Wireless refused to work with World Access over non-payment issues and from then on Beyond Wireless worked directly with Midwest Underground. ECF No. 10 at ¶ 7. Although Narbutas's declaration demonstrates when Beyond Wireless began working with Midwest Underground, it does not establish when the BW-WA contract's exclusivity provision became void, if ever. Also in early 2015, World Access engaged Midwest Underground in discussions about Beyond Wireless. ECF No. 17 at ¶ 20. Daryl Moe's declaration states that he discussed issues regarding Beyond Wireless with Midwest Underground on or about February 2015. *Id.* A Midwest Underground representative allegedly told Moe, "[w]e took your crew and there is nothing you can do about it." *Id.* This occurred around the same time Narbutas states Beyond Wireless began working directly with Midwest Underground. ECF No. 10 at ¶ 7. Whether the non-payment occurred close in time to when Beyond Wireless stopped working with World Access is important. Given the temporal proximity between the events detailed above and Midwest Underground's representative's alleged statement to Moe, a genuine issue of material fact remains regarding this cause of action's first factor.

As to the second factor, whether Midwest Underground knew of the contract between Beyond Wireless and World Access, for the reasons discussed above regarding communication between Beyond Wireless, Midwest Underground, and Word Access, a genuine issue of material fact remains.

Regarding the remaining factors, these would also benefit from further discovery. Midwest Underground argues that to survive summary judgment on this claim World Access must put forth evidence that "would permit a rational finder of fact to conclude that [the defendant's] predominant purpose was to injure or destroy [the plaintiff's business]." ECF No. 18 at 9 (citing *Wilkin Elevator v. Bennett State Bank*, 522 N.W.2d 57, 62 (Iowa 1994)). Although this formulation overstates that court's statement, the general point is well taken—World Access provides no evidence that Midwest Underground's purpose was improper. Yet, how could World Access present such evidence? The parties have not engaged in formal discovery on this or any other claim. Given the nature of the evidence needed to prevail on a tortious interference claim, if such evidence exists, Midwest Underground will likely possess it. As such, the Court declines to dismiss this claim and it survives summary judgment.

### g.  Further Discovery is Warranted

Although the Court has already made clear that the case would benefit from discovery, it nonetheless addresses World Access's Fed. R. Civ. P. 56(d) request

for additional discovery. ECF No. 14 at 8-9. In opposition, Midwest Underground argues, relying on *Blough v. Holland Realty, Inc.*, that a party making such a request must show that the evidence it seeks would prevent summary judgment. 574 F.3d 1084, 1091 n. 5 (9th Cir. 2009). That case is readily distinguishable from the instant action. In *Blough*, the summary judgment proceedings were initiated more than two years after the action was filed and much discovery had been completed. *Id.* at 1091. Here, in sharp contrast, the parties have engaged in no formal discovery and the summary judgment proceedings began a mere four months after the complaint was filed and about a month and one week after Midwest Underground filed its answer. *See* ECF No. 16 at ¶ 2; ECF Nos. 1, 5 and 6. As such, World Access's request for further discovery is granted.

**V.    Conclusion**

The Court has fully reviewed the parties' filings in considering Midwest Underground's Motion for Summary Judgment.

Accordingly, **IT IS HEREBY ORDERED**:

1. Defendant's Motion for Summary Judgment, **ECF No. 6**, is **DENIED** as to Plaintiff's:

    a. Breach of Contract claims related to the one disputed Purchase Order, the alleged Change Orders, and the four Texas work sites;

1    b.  Implied-in-Fact Contract claim[3];

2    c.  Claim for Breach of the Covenant of Good Faith and Fair Dealing;

3    and

4    d.  Tortious Interference with Contract claim.

5    2.  Defendant's Motion for Summary Judgment, **ECF No. 6**, is **GRANTED**

6    as to Plaintiff's:

7    a.  Breach of Contract claim related to the Purchase Orders that

8    Defendant has already paid.

9    **IT IS SO ORDERED**. The Clerk's office is directed to enter this Order, enter

10    judgment in accordance with this Order, and provide copies to all counsel.

11    **DATED** this 30th day of September 2016.

12    

13    _____
    SALVADOR MENDOZA, JR.
    United States District Judge

14

15

16

17

18

19

20

---

[3] The parties refer to this as the *quantum meruit* claim.

ORDER **-** 24